Filed 4/5/21  Legal Service Bureau etc. v. Orange County Bail Bonds CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| LEGAL SERVICE BUREAU, INC. dba GLOBAL FUGITIVE RECOVERY, Plaintiff and Respondent, v. ORANGE COUNTY BAIL BONDS, INC., Defendant, Cross-complainant and Appellant; v. PARWIN SADDOZAI, et al., Cross-defendants and Respondents. | G057149 (Super. Ct. Nos. 30-2015-00816859 30-2017-00914190) O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Sheila Fell, Judge.  Affirmed as modified.

Magarian & Dimercurio, Mark D. Magarian, and Krista L. Dimercurio for Defendant, Cross-complainant and Appellant.

Rutan & Tucker and Robert O. Owen for Plaintiff and Respondent.

No appearance for Cross-defendants and Respondents.

\*　　　\*　　　\*

Defendant Orange County Bail Bonds, Inc. (OC Bail Bonds) contracted with plaintiff Legal Service Bureau, Inc., doing business as Global Fugitive Recovery (Global Fugitive Recovery), to secure the return of a fugitive who had skipped bail. Under the contract, Global Fugitive Recovery was to be paid $300,000 if it contributed, even in part, to the fugitive's return. Global Fugitive Recovery thoroughly investigated the matter and determined the fugitive had fled to the Philippines. Global Fugitive Recovery then secured the involvement of the United States Marshal Service (U.S. Marshal), who ultimately captured and returned the fugitive in time to exonerate the bond, saving OC Bail Bonds $1 million. OC Bail Bonds, however, refused to pay the bounty. After a bench trial, the court determined OC Bail Bonds had breached the contract and awarded Global Fugitive Recovery $327,750 against OC Bail Bonds. OC Bail bonds also cross-complained against Parwin Saddozai (the fugitive's mother) and Imron Saddozai (the fugitive's brother). The court awarded OC Bail Bonds $326,000 against Parwin Saddozai and Imron Saddozai, jointly and severally. OC Bail Bonds appealed.

This appeal presents a substantial evidence challenge. Under longstanding rules of appellate procedure, an appellant is obligated to set forth *all* the evidence supporting the judgment—*especially* the unfavorable evidence. Here, OC Bail Bonds summarized the testimony of the principal of Global Fugitive Recovery—who described the extensive investigation leading to the discovery of the fugitive's location, as well as

2

the efforts Global Fugitive Recovery made to secure the involvement of the U.S. Marshal—panning it as self-serving and uncorroborated by written records. What OC Bail Bonds never mentioned, however, was that, on three different occasions, the principal of OC Bail Bonds acknowledged—in writing—that Global Fugitive Recovery significantly contributed to the fugitive's return. In other words, OC Bail Bonds' principal had directly corroborated the "self-serving" and uncorroborated testimony. We learned about that for the first time in the respondent's brief. As a result, OC Bail Bonds has waived its argument on appeal.

OC Bail Bonds also contends that, in an award against the fugitive's mother and brother, the indemnitors on the bail bond, the court failed to award certain costs under the contract. We agree in part and will modify the judgment to include some of those costs. As modified, we will affirm the judgment.

## FACTS

In 2014, Shikeb Saddozai was accused of forcible sex acts with a minor (Pen. Code, § 289, subd. (A)(1)(c)), kidnapping (Pen. Code, § 207, subd. (A)), false imprisonment (Pen. Code, § 236), and sexual battery (Pen. Code, § 243.4, subd. (E)(1)). To secure his release pending trial, cross-defendants Parwin Saddozai and Imron Saddozai (Shikeb's mother and brother) entered into a surety bail bond agreement (Bail Bond Agreement) with OC Bail Bonds to furnish a $1 million bond. The bond was secured by a deed of trust on Parwin's home.[1]

---

[1] We refer to the Saddozais by their first names to avoid confusion.

Prior to furnishing the bond, OC Bail Bonds retained Global Fugitive Recovery to interview Shikeb and perform a flight risk assessment, as well as to obtain his signature. Daniel Escamilla, the president and chief fugitive recovery agent for Global Fugitive Recovery, determined that Shikeb was, indeed, a flight risk. Nonetheless, OC Bail Bonds furnished the bond on August 14, 2014.

Almost immediately, Shikeb went into hiding. By missing a court hearing on August 26, 2014, he officially skipped bail. OC Bail Bonds then entered into a second agreement with Global Fugitive Recovery, which we refer to as the Recovery Contract, to capture the fugitive. Under the Recovery Contract: "This contract will be deemed successfully completed and [OC Bail Bonds'] Payment Obligations will become due if there is reinstatement of the bail bond(s) or exoneration of bail bond(s) provided that such reinstatement or exoneration is attributable in full *or part* to the efforts undertaken by [Global Fugitive Recovery]." (Italics added.) The relevant payment obligation was as follows: "Upon complete performance of this contract and if Defendant is apprehended from a location outside the continental United States . . . , and within the initial 180 day period, [OC Bail Bonds] agrees to pay [Global Fugitive Recovery] a fee of 30% of the total amount of the bail bond(s) less credit for any initial advance paid by [OC Bail Bonds]." The total amount of the bail bond was $1 million.

Global Fugitive Recovery began the process of locating Shikeb by traveling to Daly City, where Shikeb lived, and surveilling his residence and his girlfriend for several days, around the clock. It also conducted round-the-clock surveillance of Shikeb's brother, Imron, in Irvine.

Early on in the recovery operation, in September 2014, Escamilla persuaded the U.S. Marshal Service to involve itself in the case. Escamilla described the process of convincing the U.S. Marshal as follows: "[O]n some cases, we package them to try to convince the U.S. Marshal to adopt them. The U.S. Marshal has very strict guidelines set forth in a directive which only allows them to get involved in cases

4

involving violent career criminals, rape, armed robbery, kidnapping, things like that. Usually they only handle career criminals.  [¶]  But the way that I was able to package this case . . . to convince them to adopt it was that I explained to them that there had been several failed prosecutions of a similar nature and that we were dealing with a career criminal even though he only had . . . one conviction.  And I think that that was the convincing point that . . . got the U.S. Marshals to adopt this case and to collaborate with us on it to assist us in the fugitive recovery operations."  "[T]hey wouldn't have touched it had I not . . . packaged it in a manner that convinced them that it fit within their directives because it's not a case that on its [f]ace appears to fit into the directives that they have."

Global Fugitive Recovery, in conjunction with the U.S. Marshal, raided the home of Shikeb's girlfriend, who was from the Philippines.  Afterward, Escamilla interviewed the girlfriend and learned that her family was in Cebu, Philippines.  From this conversation, Escamilla formed the opinion that Shikeb was, in fact, hiding in Cebu. Although the girlfriend did not say so directly, Escamilla inferred it from her body language and the way she was speaking.  After the interview, Escamilla contacted a U.S. Marshal who had been involved in the raid of the girlfriend's house, conveying his opinion that "there was a 95 percent chance that [Shikeb] was hiding in Cebu."

Sometime later Escamilla performed a consensual search of Imron and Parwin's home (who lived together).  During the course of that search, Escamilla photographed certain credit card statements showing that Parwin had rented a satellite phone.  The U.S. Marshal used that information to further confirm that Shikeb was in the Philippines.  Based on the satellite phone, and Escamilla's inferences from Parwin's mannerisms and statements, Escamilla formed the opinion that Parwin was helping to conceal Shikeb.

Once the search in the Philippines began, Escamilla reached out to a contact in the Philippines who was a general in the military.  He did this to secure additional local

5

resources and to try ensuring Shikeb's safety. His safety was a concern due to a rash of extra-judicial killings of alleged criminals in the Philippines. Escamilla also created and circulated a wanted poster in the Philippines that ultimately made it into a popular local newspaper.

Shikeb was arrested on January 29, 2015, in Dehli, Philippines, 156 days after the recovery mission had begun, and delivered to the custody of the San Bernardino County Sheriff's Department on February 6, 2015. The recovery included contributions from at least 15 different individuals working at the behest of Global Fugitive Recovery and spanned thousands of man hours. Because Shikeb was returned to custody within 180 days after the bond was forfeited, the bond was ultimately exonerated, saving OC Bail Bonds from having to pay the full $1 million.

Afterward, OC Bail Bonds attempted to collect various charges from Parwin, including Global Fugitive Recovery's $300,000 bounty. On May 26, 2015, Robert Miller, the president and co-owner of OC Bail Bonds, wrote a letter to Parwin (Shikeb's mother) informing her she would have been liable for the entire $1 million. "However, Global Fugitive Recovery was able, through extensive contacts, perseverance, and efforts[,] to locate Mr. Saddozai in Indonesia and expedite his arrest and extradition to the San Mateo Jail."

In response, Parwin field a complaint with the California Department of Insurance. Miller replied with a letter to the insurance compliance officer justifying the charges. In the letter, Miller wrote, "Mr. Escamilla and his team, and associates in the Philippines, embarked on a 156 day fugitive recovery operation which included close collaboration with the U.S. Marshal and investigations in Daly City, San Francisco, Los Angeles, Irvine, Costa Mesa and in the Philippines the cities of Manila, Angeles City and Cebu. Thousands of man-hours were expended in this operation by Mr. Escamilla and his associates in connection with the fugitive recovery operation in this matter."

6

Although at trial, Miller would claim he had no personal knowledge of that information, he agreed that he "strongly believed" it was true and had no reason to doubt Escamilla.

On October 7, 2015, Miller wrote an e-mail to HCC Surety Group (it is unclear what role they played in the process) describing the contribution Global Fugitive Recovery made to recapturing Shikeb: "It was [Global Fugitive Recovery] who identified the defendant's location In Cebu, Philippines and passed that information on to the investigating officers in San Mateo and further informing the US Marshall [*sic*] Service as to his whereabouts (including the defendant's address). It was through [Global Fugitive Recovery's] Cebu connections, information and persistence that the US Marshalls [*sic*] in the Philippines finally made the arrest. The entire story reads like a crime novel including; a Typhoon, the Pope's visit to Cebu and other obstacles."

The consolidated matters in this appeal were initiated by Parwin (Shikeb's mother) in October 2015, who filed a complaint for an injunction and declaratory relief against, inter alia, OC Bail Bonds.  The complaint sought an injunction against foreclosure on Parwin's home and a declaration that she did not owe the $300,000 charge attributable to Global Fugitive Recovery under her contract with OC Bail Bonds.

In a separate complaint in April 2017, Global Fugitive Recovery filed suit against OC Bail Bonds for breach of contract and common counts, seeking its bounty of $300,000 (minus certain expenses OC Bail Bonds had paid) under the Recovery Contract. OC Bail Bonds then cross-complained in the same action against Parwin and Imron, seeking indemnity under the Bail Bond Agreement.  The court subsequently consolidated the three complaints.

7

A bench trial was held in April 2018, after which the court entered judgment in favor of Global Fugitive Recovery and against OC Bail Bonds, finding, "As to the claims of [Global Fugitive Recovery], the Court finds that [Global Fugitive Recovery] had significant involvement in the capture of the fugitive, Shikeb Saddozai . . . ." The court further found OC Bail Bonds was liable to Global Fugitive Recovery for penalties under the contract in the amount of $42,750, plus interest. The court ultimately entered judgment in Global Fugitive Recovery's favor in the amount of $327,750. The court found in favor of OC Bail Bonds against Parwin and Imron, concluding that "the contract [Parwin] signed specifically obligated her to pay for the expenses involved in the recovery of her son who had jumped bail," including the $300,000 charge to Global Fugitive Recovery. The court found Imron, "as Indemnitor, is jointly obligated as such to [OC Bail Bonds]." It entered judgment against Parwin and Imron and in favor of OC Bail Bonds in the amount of $326,000. OC Bail Bonds timely appealed from the judgment.

DISCUSSION

OC Bail Bonds raises two contentions on appeal: that substantial evidence did not support a finding that it breached the Recovery Agreement, and that substantial evidence does not support the court's award in favor of OC Bail Bonds and against Parwin and Imron.

I.

"'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.'" (*Foreman & Clark Corp. v.*

8

*Fallon* (1971) 3 Cal.3d 875, 881.) "'It is well established that a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact.' [Citations.] [OC Bail Bonds'] contention herein 'requires [OC Bail Bonds] to demonstrate that there is *no* substantial evidence to support the challenged findings.' . . . [Citations.] A recitation of only defendants' evidence is not the 'demonstration' contemplated under the above rule. [Citation.] Accordingly, if, as [OC Bail Bonds] here contend[s], 'some particular issue of fact is not sustained, they are required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence*. Unless this is done the error is deemed to be waived.'" (*Ibid.*) "The reason for this is that 'if the appellants fail to present us with all the relevant evidence, then the appellants *cannot* carry their burden of showing the evidence was insufficient to support the agency's decision because support for that decision may lie in the evidence the appellants ignore.'" (*Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1072.)

In light of OC Bail Bonds' approach to this case, we wish to expound upon the rule requiring a complete statement of facts. In requiring an appellant to set forth all evidence supporting the judgment, we realize the appellant does not think the judgment is supported at all. The burden, therefore, is not to set forth all evidence the *appellant* thinks supports the judgment. That would be pointless. Instead, the burden is to set forth all evidence that *arguably* supports the judgment. In other words, the appellant must put itself in the respondent's shoes, and describe all the evidence the respondent would likely assert. This is important because the purpose of a brief is to aid the court in deciding a case. By arguing a substantial evidence case without acknowledging *all* the evidence, the appellant is essentially arguing a different case. That is no help to us at all.

As to OC Bail Bonds' first contention that substantial evidence did not support the finding that it breached the Recovery Agreement, it has failed to fulfill its obligation to set forth all material evidence supporting the judgment and thus has waived the substantial evidence claim. Some of the most powerful evidence supporting the judgment were the three letters written by Miller on behalf of OC Bail Bonds, asserting that Global Fugitive Recovery had, in fact, made significant contributions toward recovering Shekib. The fact that Miller had made such admissions in writing was not mentioned *at all* in OC Bail Bonds' opening brief. What it did instead, in an apparent attempt to avoid mentioning the evidence but still somehow avoid a waiver, was to mention the *exhibit numbers*, generically describe what it was, and editorialize about why the exhibit does not matter.

Thus, for example, OC Bail Bonds discussed exhibit No. 112 as follows: "Exhibit 112 [citation] is an email that Mr. Miller sent to ACIC relating to the [Global Fugitive Recovery] Agreement and [Global Fugitive Recovery]'s contingency fee. It in no way establishes what role [Global Fugitive Recovery] did or did not play in the recapture of Shikeb. Again, Mr. Miller (the author of the email) had no personal knowledge of [Global Fugitive Recovery]'s role." Now, here is what exhibit 112 actually says: "It was [Global Fugitive Recovery] who identified the defendant's location In Cebu, Philippines and passed that information on to the investigating officers in San Mateo and further informing the US Marshall [*sic*] Service as to his whereabouts (including the defendant's address). It was through [Global Fugitive Recovery]'s Cebu connections, information and persistence that the US Marshalls [*sic*] in the Philippines finally made the arrest. The entire story reads like a crime novel including; a Typhoon, the Pope's visit to Cebu and other obstacles." OC Bail Bonds took a nearly identical dismissive and uninformative approach to exhibits Nos. 109 and 110, which contain similar admissions.

OC Bail Bonds' approach did not fulfill its duty to set forth the material evidence. Not only did OC Bail Bonds fail to apprise us of the content of exhibit No. 112, it actively misled us as to what the exhibit contained when it said it "in no way establishes what role [Global Fugitive Recovery] did or did not play in the recapture of Shikeb." Perhaps there is an argument for why this admission should not be credited, but before we ever get to that argument, we must be told what the evidence is. Having failed to do that, OC Bail Bonds has waived the issue on appeal.

II.

As to OC Bail Bonds' second contention, we agree that the evidence supports an additional award of $271.45 in expenses against Parwin and Imron. In the Bail Bond Agreement Parwin and Imron agreed, "To reimburse [OC Bail Bonds] and Surety for actual expenses incurred and caused by a breach by the Principal of any of the terms for which the application and Bail Bond were written . . . including all expenses or liabilities incurred as a result of searching for, recapturing or returning Principal to custody [and] including legal fees incurred by [OC Bail Bonds] or Surety in making application to a court for an order to vacate or to set aside the order of forfeiture or Summary Judgment entered thereon."

In the judgment, the court awarded OC Bail Bonds $326,000, which includes $300,000 for the cost of paying Global Fugitive Recovery. It is not entirely clear how the court arrived at the additional amount of $26,000. The parties stipulated that Parwin and Imron had failed to pay $25,500 in premiums on the bond as well as a $130 exoneration fee paid to the court in San Mateo. That brings us to $25,630. In addition, OC Bail Bonds presented evidence that they incurred attorney fees to exonerate the bond in the amount of $641.45. That brings us to $26,271.45.

11

We reject the remainder of the costs asserted by OC Bail Bonds.

First, OC Bail Bonds contends it is entitled to attorney fees in the amount of $1,870.78, which were incurred to institute foreclosure proceedings on Parwin's home (which were ultimately called off). The Bail Bond Agreement contains the following agreement: "To pay [OC Bail Bonds] or Surety, in the event that it is necessary for them to institute a suit *or collection*, for breach of this agreement, a reasonable attorney's fee or collection fees . . . ." (Italics added.) However, the invoice evidencing those fees was billed by "Special Default Services" to "American Contractors Indemnity Co." American Contractors Indemnity Company is not a party to this appeal and OC Bail Bonds has not shown it has standing to assert that claim.

Second, OC Bail Bonds contends Parwin and Imron are liable for $42,750 in penalties that OC Bail Bonds incurred to Global Fugitive Recovery for its failure to pay the $300,000 bounty. The Recovery Agreement contained the following penalty provision: "Any unpaid balance . . . carried beyond the seven (7) calendar days shall be subject to a single 15% penalty and interest at the annual compounded rate of 10% per year, until paid . . . ." Under this provision, the court awarded $42,750 to Global Fugitive Recovery against OC Bail Bonds. This penalty was properly *not* awarded against Parwin and Imron, however, because they are only on the hook for costs "caused by" Shekib's skipping bail. The penalty was caused not by Shikeb's conduct, but instead by OC Bail Bonds' failure to honor its contractual obligation to Global Fugitive Recovery.

DISPOSITION

The judgment is modified by awarding an additional $271.45 in favor of OC Bail Bonds against Parwin and Imron Saddozai, bringing the total award in favor of OC Bail Bonds against Parwin and Imron Saddozai to $326,271.45.  As modified, the judgment is affirmed.  Global Fugitive Recovery shall recover costs incurred on appeal as against OC Bail Bonds.  In the interest of justice, OC Bail Bonds shall bear its own costs on appeal as against Parwin and Imron Saddozai.


IKOLA, J.

WE CONCUR:


FYBEL, ACTING P. J.


THOMPSON, J.


13